798 F.2d 1113
 Bankr. L. Rep. P 71,428
In the Matter of ANDY FRAIN SERVICES, INC., International
Total Services, Inc., S.A.W. Services, Inc., Andy
Frain Florida, Inc.
Appeal of: Thomas G. WILSON.
 No. 85-1610.
 United States Court of Appeals,
Seventh Circuit.
 Aug. 21, 1986.
As Amended Oct. 6, 1986.
 
 James B. Sloan, Sloan & Associates, Chicago, Ill., for appellant.
 Daniel A. Zazove, Towbin & Zazove, Chicago, Ill., for appellee.
 Before BAUER, WOOD, and COFFEY, Circuit Judges.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Thomas G. Wilson, a shareholder of International Total Services ("ITS"), appeals numerous orders entered by the district court and bankruptcy court in the bankruptcy proceedings of Andy Frain Services, Inc. ("AFS"), ITS, S.A.W. Services, Inc. ("SAW"), and Andy Frain Florida, Inc. ("AFF") (collectively, the "debtors"). Following numerous hearings before both the district court and the bankruptcy court, the challenged orders culminated in a sale of the assets of AFS, a subsidiary of ITS, to Blair Communications Corporation ("Blair") for $4.3 million. Wilson now argues that (1) the district court erred by refusing to dismiss the chapter 11 bankruptcy proceedings; (2) the representation of multiple parties by one law firm constituted a conflict of interest; (3) the district court erred by appointing Francis D. Frain, a major secured creditor of AFS, a designated agent for AFS; and (4) the district court erred in approving the sale of the assets of AFS to Blair. We affirm the orders of the district court in all respects.[1]
 
 I.
 
 2
 We summarize only the facts necessary to consider the issues raised on this appeal.[2] Wilson, Robert Weitzel, and Richard Starke are the founders and principal shareholders of ITS. ITS is an affiliate of SAW, and the parent company of AFS and AFF. ITS, AFS, and AFF are principally in the business of providing low technology services through thousands of employees. The companies have few tangible assets. The primary assets of the companies are the accounts receivable generated from personal service contracts. The operations of the companies are labor-intensive and the companies borrow essentially all their working capital.
 
 
 3
 Citicorp Industrial Credit, Inc. ("CIC"), has provided financing for ITS on a revolving credit basis since March 1980, and for AFS since 1982, until AFS's assets were sold. The debtors gave CIC senior liens on substantially all the assets of ITS and AFS, and a second lien on the assets of AFF, to secure the loans. The terms of the various loan agreements and related documents provided that, among other things, (1) CIC would advance funds against a percentage (determined by CIC) of eligible accounts receivable, (2) all accounts receivable would be paid directly to CIC to reduce the indebtedness, (3) ITS and AFS would borrow all of their operating cash under the agreements, (4) the loans would be payable on demand, and (5) CIC would have no obligation to make further loans and could terminate funding at any time.
 
 
 4
 The problems in this case began in 1982, when Starke, Weitzel, and Wilson charged each other with misappropriation of corporate assets and other misconduct involving ITS. They ended up suing each other, with Starke and Weitzel on one side and Wilson on the other.[3] The three ITS shareholders, in a suit before Judge Parsons, agreed to settle all the litigation by allocating among themselves the assets and liabilities of ITS and its subsidiaries. On November 2, 1983, Judge Parsons entered an agreed judgment order providing in broad terms for a division of the assets and liabilities of the various companies, which was supplemented by several subsequent orders refining the shareholders' agreements (we will refer to the orders collectively as the "Wilson Case Orders").
 
 
 5
 Neither the subsidiaries of ITS nor its creditors were parties to the case before Judge Parsons. Nevertheless, the Wilson Case Orders envisioned the transfer to Wilson of substantially all of the assets, but only some of the liabilities, of AFS and AFF. In order to protect the secured creditors,[4] the orders provided that no transfer of assets to Wilson could occur without the secured creditors' express consent, i.e., the consent of CIC and the Andy Frain Dissolution Trust ("AFDT").[5]
 
 
 6
 While the shareholders quarrelled among themselves, their attention was diverted from the proper management of the companies, which compounded the financial problems the companies were suffering. As early as February 1984, CIC notified ITS and AFS in writing that defaults existed under their loan agreements[6] and CIC demanded full payments. CIC had provided substantial overadvances[7] to both companies to cover payroll and other operating expenses, further reflecting the companies' problems with deteriorating cash flow.
 
 
 7
 In May 1984, the Internal Revenue Service ("IRS") threatened to file tax liens against the companies. CIC informed AFS and ITS it would not continue to lend funds to the companies if tax liens were filed because any liens securing the loans would be inferior in priority to the IRS tax liens. Meanwhile, AFDT announced that it would, as a result of defaults by AFS upon the obligations owed to AFDT, foreclose upon its collateral by conducting a public sale of the Andy Frain headquarters and the Andy Frain stock on June 28, 1984. With these and other economic problems confronting them, the companies filed voluntary bankruptcy petitions with the bankruptcy court on June 11, 1984. ITS requested, and received, from CIC advanced funds pursuant to the loan agreement in order to pay the retainer for its lawyers, the firm of Nachman, Munitz & Sweig ("NM & S").
 
 
 8
 The companies immediately moved in the bankruptcy court for approval of NM & S as counsel for all four debtors, in part so that AFS and ITS could obtain post-petition financing to continue operations as debtors-in-possession. Bankruptcy Judge Hertz recognized that the companies would have to cease operations absent the entry of financing orders and approved the retention of NM & S, over Wilson's objection that it was a conflict of interest for one lawyer to represent both ITS and AFS.
 
 
 9
 On June 15, 1984, ITS and AFS came before Judge Hertz and presented applications to borrow money from CIC and grant CIC a security interest. Judge Hertz observed that there was no dispute that AFS and ITS required financing to continue in business and no party except CIC was willing to lend funds to AFS or ITS under the terms proposed in the applications. The respective financing orders, entered by Judge Hertz on June 15, 1984, provided, among other things, for CIC to continue to lend funds to the companies on a secured, discretionary basis and to maintain a first lien and security interest on substantially all the assets belonging to AFS and ITS. Under the orders, CIC could cease lending funds to AFS or ITS at any time upon five days' notice to the respective borrowers and the Official Unsecured Creditors' Committee ("Committee").[8]
 
 
 10
 Following the entry of the financing orders,[9] Wilson notified CIC on June 18, 1984, that he would no longer accept management responsibility for AFS and AFF without approval by Judge Parsons, claiming that the bankruptcy proceedings violated the Wilson Case Orders.[10] Wilson's agents also resigned. Because Wilson refused to request funding from CIC for the benefit of AFS, the AFS payroll checks issued to employees on June 15, 1984, appeared destined to bounce. ITS intervened at the last minute and its emergency authorization permitted CIC to advance funds to cover the AFS payroll. Otherwise AFS would have been out of business.
 
 
 11
 Following Wilson's resignation,[11] Judge Parsons suggested that Francis Frain be appointed designated agent to operate AFS. Frain, whose management capabilities all of the parties including Wilson acknowledged, had been involved with AFS since he was fifteen years old and had significant experience managing it. Following Judge Parsons' suggestion, CIC, AFS, AFF, AFDT, and the Committee moved that Frain be appointed designated agent to operate AFS, and Judge Parsons granted the motion after consulting with Judge Hertz. At the time of Frain's appointment, all of the parties, including Wilson, knew that Frain was part of AFDT, which asserted a claim in excess of $2 million against AFS, yet no one objected to Frain's appointment on that ground, although Wilson did object on other grounds.
 
 
 12
 At various times throughout the proceedings, Wilson objected to the bankruptcy proceedings as having been initiated without proper corporate authority and as being contrary to the Wilson Case Orders. On September 6, 1984, after his objections had gone unheeded, Wilson filed a motion to dismiss the bankruptcy proceedings in the bankruptcy court and in the district court, based upon the Wilson Case Orders. AFS, the Committee, AFDT, and CIC all filed memoranda in opposition to Wilson's motion. CIC argued in its memorandum and the affidavits filed in support thereof that continuation of the proceedings did not violate the Wilson Case Orders and was in the best interests of creditors. The affidavits were uncontroverted.[12]
 
 
 13
 On October 1, 1984, involuntary bankruptcy petitions were filed against AFS and ITS by unsecured creditors of each company. The involuntary petitions were later consolidated with the voluntary proceedings. Even though Wilson claimed he owned AFS, Wilson never filed an answer in response to the involuntary petition. Wilson's attorney admitted that AFS and ITS were not paying their debts as they came due.
 
 
 14
 Following the involuntary petitions, CIC, on October 15, 1984, filed a motion requesting, among other things, the district court to continue the hearing on the motion to dismiss, set a discovery schedule, hold an evidentiary hearing on Wilson's motion, and clarify the impact of the involuntary petitions on the motion to dismiss. In response to CIC's motion, Wilson argued that no evidentiary hearing on the motion to dismiss was necessary because the facts were not in dispute and the district court could decide the matter on the present record, taking judicial notice of the court's prior orders.
 
 
 15
 While Wilson continued to claim that the bankruptcies should be dismissed as violative of the Wilson Case Orders, the other parties attempted to work out a solution acceptable to all involved including Wilson. The other parties agreed, at various times, either to dismiss the proceedings or to tender to Wilson the AFS stock and secure the resignation of NM & S, provided Wilson could, as required by the Wilson Case Orders, obtain CIC's and AFDT's consent and demonstrate an ability to satisfy the creditors. Wilson never attempted, however, to show he had the financial ability to comply with the terms of the Wilson Case Orders. Nor did Wilson attempt to demonstrate that dismissal was in the best interests of creditors because he had the financial resources to pay them. Rather than present evidence of his financial ability to consummate the Wilson Case Orders, offer to finance a plan, or demonstrate that dismissal was in the best interests of creditors, Wilson merely talked in generalities about how he could work things out. Wilson refused to answer questions about his ability to comply with the Wilson Case Orders at a Fed.R.Bankr.P. 2004 examination.[13] Wilson finally did provide Judge Parsons with certain financial information in camera, but Judge Parsons found, in February 1985, that Wilson's financial information was without any trustworthiness, a finding in which we concur.
 
 
 16
 Although Wilson refused to inform anyone how he planned to comply with the Wilson Case Orders, Judge Parsons set a November 22, 1984 hearing date for Wilson's motion to dismiss. Judge Parsons then granted a joint motion by CIC and Wilson to continue the hearing date until December 5, 1984, to allow the parties additional time to negotiate. On December 7, 1984, Judge Parsons met with the parties in chambers to consider the most appropriate means of preserving the companies. CIC informed the court it intended to file a motion to sell AFS and AFF shortly. Judge Parsons suggested that the process to sell AFS and AFF begin and told Wilson to participate in the bidding process and file a written proposal for acquisition of AFS on terms equal to or better than third parties. Judge Parsons took under advisement Wilson's motion to set a hearing on the motion to dismiss.
 
 
 17
 Both Judge Hertz and Judge Parsons ultimately found that a sale of AFS was the only means to preserve AFS as a going concern. CIC had informed AFS that it was not prepared to increase its loans to AFS to meet AFS's increased seasonal expenses, which would begin in April with the start of the baseball season and continue thereafter. Without additional funding to pay its larger seasonal payroll AFS would collapse. No substitute financing was available. AFDT indicated that it intended to foreclose on its junior security interest in AFS assets. Without a sale, it appeared that AFS would go out of business and be forced to liquidate. If so, unsecured creditors and equity holders were likely to receive nothing.
 
 
 18
 On February 4, 1985, CIC, AFDT, and the Small Business Administration filed a joint motion for an order authorizing the sale of substantially all of the assets of AFS and AFF.[14] The motion was presented before Judge Parsons on February 5, 1985. The motion requested a schedule for the filing of objections to the sale and secured creditors' claims. The proposed terms of the sale and purchase contract were attached as exhibits. The motion requested hearings prior to the sale on, among other things, any objections to the proposed sale. At the February 5 hearing, Judge Parsons allowed Wilson's counsel to make a lengthy "proffer of evidence."
 
 
 19
 Judge Parsons directed the parties to appear before Judge Hertz to establish a schedule for hearings and to determine the terms of an appropriate order to be signed by the bankruptcy court and district court. On February 7, 1985, CIC presented a motion to set hearing dates before Judge Hertz, who directed CIC's counsel to prepare a single draft order and notice and further directed the parties to reappear on February 12, 1985, for argument on the draft.
 
 
 20
 Subsequently, CIC circulated the proposed draft order and notice. The draft order contemplated that hearings on the proposed sale, allocation of proceeds, valuation of assets, payment of proceeds, and objections thereto would be heard by Judge Hertz. The actual sale would be conducted before Judge Parsons. All parties appeared before Judge Hertz on February 12, 1985, and presented their positions with respect to the proposed draft order. Dates acceptable to Judge Hertz for the hearings to be conducted before Judge Hertz were set and, later that day, Judge Parsons and Judge Hertz both signed the order and notice. The order and notice explicitly provided for objections to the sale and other matters to be filed with the bankruptcy court by certain dates.[15] Copies of the order and notice went out to all creditors. Notice of the sale, containing the sale date (March 29, 1985) and informing the reader that additional information could be obtained from the Committee's counsel, was also published in the New York Times (March 3 and 10), Wall Street Journal (February 28 and March 14), Crain's Chicago Business (March 4), and Miami Herald (March 3 and 17).
 
 
 21
 On February 12, Judge Parsons issued a memorandum and order regarding Wilson's motion to dismiss. Judge Parsons noted that under the Wilson Case Orders, Wilson had no interest in AFS and AFF and remained a shareholder of ITS because CIC had never consented to the transfer of assets to Wilson, which was a necessary precondition to the orders taking effect. At that time Judge Parsons did not find it necessary to deny Wilson's motion outright, however, so he merely declined to rule on it.
 
 
 22
 On March 13, 1985, the parties and several witnesses appeared before Judge Hertz for the evidentiary hearing on the sale of AFS and AFF. Wilson's counsel claimed he had not received adequate notice of the hearing and informed the court he would not participate.[16] The movants presented documentary evidence, relevant portions of the record, the testimony of William Kennedy, Vice President of CIC, and the testimony of Francis Frain in support of the sale. Wilson's counsel, his "nonparticipation" notwithstanding, participated in the hearing by examining and objecting to much of the evidence. Judge Hertz provided Wilson's counsel with an opportunity both to cross-examine the witnesses and present evidence. At the close of the evidence, Wilson's attorney presented Wilson's legal objections to the proposed sale. At the conclusion of the hearing, Judge Hertz found that AFS and AFF had joined the motion through their participation at the hearing and directed that a draft order authorizing the sale be submitted.
 
 
 23
 A proposed draft order was circulated to all parties following the hearing on March 13, 1985, and a revised proposed draft order was tendered to all parties and submitted to Judge Hertz for his consideration on March 14, 1985. Judge Hertz reviewed the proposed order and considered each of Wilson's objections to various provisions of the proposed order. After considering Wilson's objections and hearing from all the other parties, Judge Hertz entered the draft order. Judge Hertz then made a number of findings, based upon the evidence at the hearing, that supported the sale.
 
 
 24
 On March 18, 1985, CIC formally notified all the parties that, absent full repayment of its loan, it intended to exercise its enforcement rights on April 2, 1985. Throughout the proceedings, CIC refused to consent to a transfer of the assets of AFS to Wilson, as was its right, because Wilson refused to demonstrate the ability and willingness to assume AFS's debts to CIC, as the Wilson Case Orders required. On March 26, 1985, Wilson filed a petition for a writ of mandamus to the Seventh Circuit Court of Appeals, asking us to compel Judge Parsons to rule on Wilson's motion to dismiss.[17]
 
 
 25
 On March 29, 1985, Judge Parsons conducted a public sale. The Committee had distributed bid packages, containing terms of the sale and the proposed purchase contract, to forty interested parties. Three potential purchasers attended the sale--Canteen, National Guardian Corporation ("NGC"), and Blair Communications Corporation ("Blair"), a company recently formed by the Frains. None of the three were willing to bid for AFS and AFF on the terms spelled out in the bid package, however.
 
 
 26
 Blair then informed the court that its shareholders (the Frains) had pledged sufficient collateral to raise the financing to make a bid to purchase AFS, although not on the terms of the bid package. CIC agreed to continue funding AFS until the court could conduct a hearing on Blair's bid, provided CIC received additional collateral to secure the advances. The shareholders of Blair were prepared to pledge their own assets to provide the additional collateral, if they could obtain provisional approval of the bid. Canteen and NGC disclosed their respective bids, and neither equalled or exceeded Blair's. The court then declared a recess, allowing Blair to negotiate further with the Committee and AFS, with whom Blair had not yet reached complete agreement on the bid.
 
 
 27
 Following the recess, Blair announced it had increased its bid and reached agreement with the Committee and AFS. Blair's bid, as finalized, proposed to purchase AFS for $4,325,000, which included the assumption of CIC's secured claim and AFDT's secured claim. Blair had earlier informed the court that a condition of its bid was the release of claims against AFDT and a resolution of the AFDT claim. After payment to CIC, the bid provided $825,000 for the estate, payable in installments. Neither Canteen nor NGC revised its bid, and Blair requested that the court promptly consider its proposal and provisionally approve it or require other bidders to show cause why their bids were better. Despite the fact that AFS, the Committee, AFDT, and CIC all supported the revised Blair bid, the court refused to conditionally approve the bid and recessed the hearing until April 1, 1985, to allow the parties further time to negotiate.
 
 
 28
 None of the bidders submitted a revised bid when the hearing resumed on April 1, 1985. Acknowledging the crisis confronting AFS, which stemmed from its inability to obtain continued funding from CIC, Judge Parsons, during the hearing on April 1, 1985, conditionally accepted the Blair proposal, subject to a hearing on April 8, 1985, at which time the court would consider the Blair bid, any subsequently submitted competing bids, and objections to the Blair bid. Blair's counsel again read into the record the essential elements of Blair's proposal, including the proposed resolution of the AFDT claim and the payment of $825,000 in installments to the estate.
 
 
 29
 At the April 1, 1985 hearing, Judge Parsons vacated his February 12, 1985 order to the extent that in February he had declined to rule on Wilson's motion to dismiss. He denied the motion, concluding that the bankruptcy petitions had not been fraudulently originated, a dismissal would not be in the best interests of creditors, and the bankruptcy proceedings provided protection for all concerned parties.
 
 
 30
 Notice of the April 8, 1985 hearing was served on Wilson, the related debtors, members of the Committee, Canteen, NGC, and the forty prospective purchasers who had received a bid package and signed a confidentiality agreement. Furthermore, notice of the hearing was published in the Saturday and Sunday Chicago Tribune (April 6 and 7).
 
 
 31
 On April 8, 1985, Judge Parsons conducted an evidentiary hearing on the Blair proposal. No other bids were submitted. Neither Canteen nor NGC availed themselves of the opportunity to revise their previous bids, although both received notice of the opportunity to do so. Francis Frain, Michael Frain, Nancy Shanik (the Vice President of CIC responsible for the AFS account), and Joseph Hinkle (a partner at Arthur Andersen who had been retained by the Committee to value AFS and AFF) testified in support of the sale. Among other things, Francis Frain testified that he had effectively insulated himself from any decisions or negotiations regarding Blair's bid for AFS.
 
 
 32
 Wilson's counsel cross-examined all four witnesses[18] and introduced evidence. Although Wilson's counsel claimed the next day he was denied an opportunity to present witnesses, he neither asked to present any witnesses nor informed the court that he had any witnesses. Wilson did not attend the hearing. Wilson's counsel acknowledged he had no counter witness to Mr. Hinkle. Wilson has never alleged that he in fact had witnesses present at the hearing who were not allowed to testify.
 
 
 33
 Judge Parsons approved the Blair bid and requested the submission of a draft order. Following another hearing on April 9, 1985, during which Wilson objected to much of the proposed order, Judge Parsons entered an order approving the sale. In approving the Blair bid, AFS, the Committee and ITS agreed to release any claims against AFDT and AFDT's secured claim against AFS was settled for $2.5 million; Blair purchased the assets of AFS subject to the resolved claim of AFDT. Judge Parsons found this resolution of the AFDT claim to be fair and reasonable and overruled Wilson's objections to AFDT's claim. Judge Parsons recognized that the acceptance of the Blair bid was crucial to ensure AFS's continued economic survival.
 
 
 34
 Judge Parsons denied Wilson's oral request to stay the sale. On April 15, 1985, Wilson appealed several orders, principally the orders of Judge Parsons and Judge Hertz approving the sale. Wilson failed to seek a stay from our court pending appeal. On April 19, 1985, the sale was completed and the title to AFS passed to Blair.
 
 II.
 
 35
 Before considering Wilson's arguments, we note that many of his contentions are difficult to address because they are based so heavily upon Wilson's own version of the facts. See supra note 2. Essentially, Wilson argues that all the other parties, including at some times the courts, were conspiring to violate Judge Parsons' orders in the prior lawsuit between the shareholders of ITS. Wilson argues that the Wilson Case Orders gave him the equity ownership of both AFS and AFF, and thus the bankruptcy petitions were an attempt to circumvent the orders and steal his equity in the companies. Throughout the proceedings, Wilson's attorneys branded the actions of other parties such as CIC, NM & S, and the Frains as further acts in the conspiracy against Wilson.
 
 
 36
 Wilson's continued assertion of this theory is difficult to understand, because even a cursory reading of the Wilson Case Orders reveals that Wilson never complied with the orders, and thus Wilson did not own AFS and AFF. The Wilson Case Orders clearly spell out that the assets of AFS and AFF could not be transferred to Wilson absent the express written consent of the secured creditors. Therefore, as Judge Parsons concluded in his February 12, 1985 memorandum opinion and order:
 
 
 37
 A critical part of this agreement is paragraph nine which provides that the agreement is subject to the express written consent of secured creditors....
 
 
 38
 Citicorp never consented to the transfer of assets to Thomas Wilson and thus the terms of this court's orders dividing the companies were never activated and Wilson continued to be a shareholder along with Stark and Weitzel who held a majority of the stock between the two of them....
 
 
 39
 Citicorp has never agreed to the division of assets and, thus, Stark and Weitzel remained controlling shareholders. As such, they took the action they took, whether good or bad, on behalf of all the companies.
 
 
 40
 Moreover, the record is replete with instances where the other parties invited Wilson to demonstrate his ability to comply with the Wilson Case Orders. Wilson never did. The one time he presented financial evidence of his ability to comply with the orders to Judge Parsons in camera, the judge found the information to be untrustworthy and unpersuasive. Given the above, we are at a loss as to what motivated Wilson to maintain his disruptive posture throughout the bankruptcy and district court proceedings. Nevertheless, we shall address each of the issues Wilson raises.
 
 A.
 
 41
 Wilson argues first that the district court erred by denying Wilson's motion to dismiss the chapter 11 proceedings. Wilson also complains that the court failed to conduct evidentiary hearings on contested matters and promulgate findings of fact. This argument is without merit.
 
 
 42
 Wilson filed his motion to dismiss on September 6, 1984, alleging that the jurisdiction of the bankruptcy court had been fraudulently invoked in contravention of the Wilson Case Orders. AFS, the Committee, AFDT, and CIC opposed Wilson's motion, pointing out that the bankruptcy proceedings were in the best interests of the creditors. CIC filed affidavits in support of its position, and Wilson failed to file any counter-affidavits or depose CIC's affiants.
 
 
 43
 On February 12, 1985, Judge Parsons issued an order regarding Wilson's motion to dismiss. At that time, he declined to grant the motion, but he did not deny it either. On March 26, 1985, Wilson filed a petition for writ of mandamus with our court, asking us to order Judge Parsons to rule on his motion to dismiss. Based solely upon the allegations in Wilson's petition, we directed Judge Parsons to rule on Wilson's motion before authorizing or approving a sale of AFS. Judge Parsons had already denied Wilson's motion by the time he received our directive, but he read our mandate and reiterated his ruling in an order dated April 1, 1985.
 
 
 44
 We find Wilson's assertion that Judge Parsons refused to comply with our mandate utterly frivolous. We directed Judge Parsons to rule on Wilson's motion, which he had already done by the time he received our mandate, and he followed our directions by restating his ruling, along with our opinion, both on the record and in a written order.
 
 
 45
 Wilson's real complaint seems to be that Judge Parsons failed to conduct a hearing and make findings of fact. Wilson waived any right he might have had to an evidentiary hearing, however, by his counsel's repeated argument to the court that no evidentiary hearings were necessary. For example, at both the September 13, 1984 and October 15, 1984 hearings, Wilson's attorney James Sloan argued forcefully that there were no disputed facts.[19] Having consistently argued to the district court that no hearing was necessary, Wilson cannot now, merely because the court ruled against him, argue that it was error for the court not to conduct a hearing. We also note that, on appeal, Wilson fails to identify a single contested issue which would have necessitated a hearing.
 
 
 46
 Moreover, we have no jurisdiction to review an order under 11 U.S.C. Sec. 305(a) refusing to dismiss a bankruptcy case. See 11 U.S.C. Sec. 305(c). Wilson argues that the record is empty as to what statutory right he relied upon in bringing his motion to dismiss. That is not correct, however. Wilson's motion was discussed at a November 8, 1984 hearing, at which time both Judge Parsons and an attorney representing Wilson, specifically cited section 305.[20] Tr. at 13, 16. Therefore, even if Wilson had not waived his right to a hearing, we would have no jurisdiction to review Judge Parsons' decision to deny Wilson's motion to dismiss.
 
 B.
 
 47
 Wilson's next argument is that it was a conflict of interest for one law firm to represent multiple parties in these proceedings. On June 12, 1984, Judge Hertz, the bankruptcy judge, entered an order authorizing the debtors to retain NM & S as their bankruptcy counsel. Wilson claims that having one law firm as counsel for all the debtors created divided loyalties. Wilson claims that NM & S admitted a conflict of interest, but his quotations from the record are obviously out of context and do not support his argument.
 
 
 48
 We can also dispense quickly with one other factual misstatement which Wilson repeats numerous times. CIC did not "procure" NM & S to commence the proceedings. What actually happened was that CIC, at ITS's request, loaned ITS the funds (pursuant to their loan agreement) to pay the retainer for NM & S, ITS's counsel. This loan was neither unusual nor sinister, since ITS borrowed essentially all of its operating cash from CIC, and without the loan ITS could not have paid the retainer necessary to hire counsel.
 
 
 49
 Before reaching the merits of Wilson's argument, however, we must decide whether we have appellate jurisdiction to review an order of the bankruptcy court. Judge Parsons never ruled upon Wilson's claim. Wilson asserts in his brief that "[t]he temporary order of appointment of Judge Hertz was effectively affirmed in every respect by Judge Parsons' denial of any right of review," but Wilson cites no authority, and we know of none, for this "effective affirmance" theory. We do not think that a party can argue that, for purposes of an appellate court's jurisdiction, inaction by the district court is the same as an affirmance. Wilson's counsel requested that the district court set a briefing schedule at the August 21, 1984 hearing, at which time the court was not prepared to set a schedule, and there is no indication that Wilson pursued the matter thereafter and Wilson has never filed a brief with the district court on the issue. Furthermore, the Bankruptcy Rules set up a briefing schedule, see Fed.R.Bankr.P. 8009, so it was not necessary for Judge Parsons to set a schedule. Although we find it unnecessary to decide whether Wilson can still proceed with his appeal in the district court, it is clear that the district court has never ruled upon Wilson's conflict of interest claim.
 
 
 50
 We are faced, therefore, with the question of whether we have jurisdiction to review an order from the bankruptcy court. Perhaps because he recognized the difficulty of the task, Wilson chose not to advance any argument for appellate jurisdiction over the bankruptcy court order, relying instead upon his theory that the order was "effectively affirmed" by the district court, a theory we reject.
 
 
 51
 The appellate jurisdiction provision of the bankruptcy code, 28 U.S.C. Sec. 158, provides that the district courts shall have jurisdiction over appeals from final judgments, orders, and decrees of the bankruptcy courts, and circuit courts of appeals shall have jurisdiction over appeals from final decisions, judgments, orders and decrees of the district courts.[21] Courts of appeals have no jurisdiction to consider direct appeals from bankruptcy court orders. See Securities and Exchange Commission v. Danning (In re Carter), 759 F.2d 763 (9th Cir.1985); Thistlethwaite v. First National Bank of Lafayette (In re Exclusive Industries Corp.), 751 F.2d 806 (5th Cir.1985). Therefore, we dismiss for lack of jurisdiction Wilson's appeal of the bankruptcy court's order authorizing the debtors to retain NM & S as joint counsel.
 
 C.
 
 52
 Wilson argues Francis Frain was prohibited from acting as a court-appointed agent for AFS, a debtor of which he, through AFDT, was a secured creditor. Wilson argues without any substantiation that the "Frains' sole interest was to achieve a sale of AFS assets rather than assist in its economic rehabilitation." Although Wilson now asserts that "[i]t was apparent from the outset that Francis Frain was an inappropriate choice to serve as designated agent because of inherent conflict of interest dangers," the alleged conflict was evidently not apparent enough for Wilson to raise the issue with the district court during any of the at least twenty-four hearings between June 19, 1984, and April 8, 1985, the time period beginning when Judge Parsons first suggested Frain as designated agent and continuing through Judge Parsons' approval of the sale. Wilson's only complaint at that time was that Frain lacked the necessary financial expertise.[22] Moreover, Wilson fails to acknowledge that it was his own abdication of responsibility that created the crisis which necessitated the appointment of someone familiar with AFS to keep the company in business.
 
 
 53
 More significant, however, is Wilson's argument that AFDT was absolutely disqualified from purchasing the assets of AFS because of Francis Frain's role as court-appointed agent for AFS. CIC, Blair, AFDT, and Frain contend that Wilson's appeal from Judge Parsons' order approving the sale of AFS is moot because Wilson failed to obtain a stay pending appeal. 11 U.S.C. Sec. 363(m).[23] Thus, although appellees also contend Wilson is incorrect in arguing that AFDT was either absolutely disqualified or disqualified on the facts of this case, they contend that we need not reach the merits of this issue.
 
 
 54
 Section 363(m) requires that the party appealing an order approving a sale of property to a good faith purchaser obtain a stay of the sale pending appeal. Fed.R.Bankr.P. 8005 generally requires the appellant to post a bond or other security to cover any loss to the purchaser caused by the delay of an appeal should the appeal prove unsuccessful. Such a procedure is, of course, essential in bankruptcy cases, for without such protection for good faith purchasers, few, if any, persons would participate in federal bankruptcy sales. Therefore, our circuit has consistently held that a would-be appellant's failure to obtain a stay of a sale to a good faith purchaser renders an appeal from the order authorizing and confirming the sale moot. See In re Vetter Corporation, 724 F.2d 52, 56 (7th Cir.1983) ("[I]f a party appeals a bankruptcy judge's order, authorizing and confirming a sale to a good faith purchaser, the order must be stayed pending appeal, otherwise the issue becomes moot on appeal.").
 
 
 55
 Because Wilson failed to obtain a stay and offers no credible explanation for the failure, the only issue we must decide is whether AFDT qualified as a good faith purchaser.[24] Although Wilson presents a number of reasons why we should find bad faith, none of them are persuasive.
 
 
 56
 Wilson's major argument appears to be that it was per se bad faith for a court-appointed agent of the debtor to have an interest in the purchase of the debtor. That is not the law. In In re Rock Industries Machinery Corp., 572 F.2d 1195 (7th Cir.1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m)), we said:
 
 
 57
 The requirement that a purchaser act in good faith, of course, speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.
 
 
 58
 Id. at 1198 (emphasis added). Even if Frain were a fiduciary, a sale to him without more would not suffice to show a lack of good faith. See In re Exennium, Inc., 715 F.2d 1401, 1404-05 (9th Cir.1983) (citing our opinion in In re Rock Industries).
 
 
 59
 Moreover, although Wilson repeatedly attempts to make Frain into a trustee, it is clear that Frain's role in AFS was much more limited. Judge Parsons appointed Frain to oversee the day-to-day running of AFS. The NM & S law firm represented the debtor-in-possession and oversaw the rehabilitation efforts. Indeed, the fact that Blair's purchase of AFS created no conflict of interest for Frain in his position as designated agent of AFS is underscored by the fact that Wilson, who objected constantly to almost everything that occurred in the proceedings,[25] in his briefs fails to cite a single specific instance prior to the court's final approval of the sale where he raised this objection to Judge Parsons.
 
 
 60
 Wilson states repeatedly, in conclusory terms, that Frain was only interested in selling AFS, not rehabilitating it, and that Frain was acting in the interest of AFDT, not AFS. As we pointed out before, Judge Parsons appointed Frain to keep AFS functioning when Wilson abandoned its management. It was never part of Frain's appointed job to work out how AFS would be rehabilitated. In fact, Wilson points to nothing in the record whatsoever which supports his position that Frain was a trustee of AFS.
 
 
 61
 Therefore, we must look to what the record actually reflects to determine whether Blair qualifies as a good faith purchaser. The record abounds with evidence that Blair acted in good faith. As soon as it became apparent that no bids consistent with the bid packages for the nationally advertised sale of AFS were forthcoming, Blair, as well as Canteen and NGC, entered nonconforming bids. Even though all the parties and the court were well aware of the Frain family's role in Blair, the Frains brought it out on the record to avoid any appearance of secret interests.
 
 
 62
 At the confirmation hearing on April 8, 1985, Mr. Hinkle, an expert witness for the Committee, testified that the Blair proposal had the highest value of all the bids. Wilson did not personally attend the hearing, and his attorneys presented no contrary evidence and informed the court they had no rebuttal witness. Francis Frain testified under oath that he took no part in the negotiations with Blair, did not confer with AFS's counsel or the Committee about the purchase, and made no recommendations about the Blair bid. Wilson, on appeal, can point to nothing that calls Frain's integrity into question.
 
 
 63
 Nor does Wilson spell out how Blair could have taken advantage of other potential bidders. Following Blair's bid, each of the forty parties who had previously received a bid package (including NGC and Canteen), as well as Wilson himself, had an opportunity to top the Blair bid. No one came to the April 8 hearing with a better offer. This is compelling evidence that the Blair bid was a fair offer, for if it undervalued AFS another party could have made a slightly better offer and obtained the assets of AFS at a bargain at the April 8 hearing.
 
 
 64
 Wilson never, on appeal, goes beyond unsupported accusations to tell us what evidence exists that might show bad faith, or even what evidence he would hope to establish on remand. This is merely an extension of Wilson and his attorneys' conduct throughout the numerous proceedings before Judge Parsons. Because we find all of Wilson's arguments about Blair's bad faith to be either conclusory allegations without support in the record or based upon misrepresentations of what transpired in the district court, we see no reason to subject the district court and the other parties in the case to any further harassment by Wilson and his attorneys. Wilson, through his counsel, was fully aware that if he intended to challenge this sale on appeal, section 363(m) required him to obtain a stay. He chose to ignore the law and now must accept the consequences.
 
 
 65
 We address two other points related to this issue, lest we too be accused of joining the conspiracy. Wilson argues that the Blair bid was not as substantial as it appeared because it paid off the CIC and AFDT secured claims, which Wilson says were disputed. Wilson offers no credible rationale for disputing the CIC claim, and we find none. The only proof Wilson presented at the April 8 hearing to dispute the AFDT claim was a letter from NM & S to AFDT. In the letter, NM & S (as counsel for ITS) requested information concerning approximately $520,000 of the $2,500,000 claim. NM & S denied that the letter evidenced any defects in the AFDT claim, and in fact ITS later released all of its claims against AFDT and approved the bid.[26] Moreover, Wilson concedes that in his order of April 9, 1985, Judge Parsons resolved Wilson's objections to the AFDT claim by overruling them. Wilson does not argue that this finding was clearly erroneous or based upon an error of law. Wilson had his opportunity to present his evidence, and indeed he took advantage of it to the limited extent he could given the lack of factual and legal support for his arguments, during the April 8, 1985 hearing. Once again, Wilson is trying to blame the district court for his own failure to protect his alleged interests.
 
 
 66
 Also, Wilson attempts to argue that even if the sale of AFS is moot, certain elements of the sale agreement, such as the resolution of objections to the secured claims, are still fair game on appeal. Wilson cites no authority for this position, and we find it to be contrary to both the letter and the spirit of section 363(m). If a party could willfully ignore the law, as Wilson has done, and then upset a sale to a good faith purchaser by attacking specific terms of the sale agreement, section 363(m) would be meaningless. Given the important role section 363(m) plays in assuring a good faith purchaser at a bankruptcy sale good title, we find that the sale, including all of its terms, cannot be challenged on appeal when the appellant fails to obtain a stay.
 
 
 67
 Finally, Wilson claims that "it has been repeatedly admitted in open Court by Appellees after the sale was approved that Francis Frain was in a conflict of interest position as both the buyer and seller of AFS assets, and therefore disqualified as a purchaser under Sec. 363(b)." One would think that if Frain or anyone speaking on his behalf had actually made such a concession, i.e., that Blair was disqualified as a purchaser, Wilson would not have added this as a mere afterthought to his argument on bad faith. Furthermore, one might expect that a party in possession of such a decisive "smoking gun" on a crucial issue would supply the court with at least one cite to a place in the record where one of these alleged repeated admissions occurs. Our independent review of the proceedings before Judge Parsons, which was necessitated by Wilson's pattern of misrepresenting and omitting crucial facts, reveals that neither Frain nor anyone else speaking on his behalf said that Blair was disqualified from purchasing the assets of AFS. In fact, Frain testified under oath that he was completely screened off from the negotiations so that there would be no appearances of impropriety. Perhaps Wilson, recognizing that he might have to face the music for his failure to follow section 363(m), thought that we might give some credence to his unsupported recitation of Frain's alleged admission. As we pointed out above, however, see supra note 22, once a party attempts to mislead the court in one instance, we view every statement, particularly ones unsupported by references to record, with a more critical eye.
 
 
 68
 To summarize, the issue with respect to the sale of the assets of AFS to Blair is moot under section 363(m). Wilson knew the law and chose not to follow it and must now accept the consequences. There is no evidence of bad faith on the part of Blair, and Wilson does not even allege any specific acts of bad faith he might be able to prove on remand. Conversely, there is substantial evidence that Francis Frain, as court-appointed agent of AFS, conducted himself with a great deal of integrity. Moreover, Blair's good faith in the proceeding is underscored by the fact that no party, including Wilson, offered a higher bid for AFS.
 
 
 69
 Our review of the district court record reveals that Judge Parsons, under very difficult circumstances, showed great concern for salvaging AFS and protecting the jobs of its numerous employees. To that end, he repeatedly encouraged all the parties, through their attorneys, to work out a mutually acceptable solution. Every party, with the notable exception of Wilson, heeded Judge Parsons' admonitions. Wilson's attorneys now attempt to justify their actions in the district court as "firm and forceful advocacy," but repeated ad hominem attacks against other parties and counsel and intemperate behavior towards other counsel and the courts is neither "firm and forceful," nor effective, advocacy. Judge Parsons and Judge Hertz, as well as the appellees and their counsel, are to be commended for their patience and self-restraint in continually seeking to reach a resolution acceptable to all interested parties, in spite of Wilson's disruptive behavior. We find most unfortunate Wilson's decision to continue on this appeal his practice of making ad hominem attacks and unsupported accusations against the bankruptcy and district courts and the other parties.
 
 III.
 
 70
 In conclusion, Judge Parsons' order denying Wilson's motion to dismiss the chapter 11 bankruptcy proceedings is affirmed. Wilson's appeal of the bankruptcy court's order certifying NM & S as counsel for all four debtors-in-possession is dismissed for lack of jurisdiction. Finally, the sale of the assets of AFS to Blair is a moot issue because Wilson failed to comply with 11 U.S.C. Sec. 363(m). Therefore, the decisions and orders of the district court are AFFIRMED.
 
 
 
 [1]
 On May 20, 1985, the appellees in this case filed a joint motion to dismiss Wilson's appeal. Wilson filed a response opposing the motion. On August 7, 1985, this court issued an order providing that the panel considering the merits of the appeal would also consider the motion to dismiss
 
 
 [2]
 This exercise is needlessly complicated by Wilson's lack of candor in representing the district court record. Rather than setting out the relevant facts, Wilson has attempted to twist the record to support his bizarre theory that all the other parties to this case, including at times both the district court judge and the bankruptcy judge, were conspiring to steal Wilson's interest in AFS and AFF. Wilson's brief is a clear violation of Circuit Rule 9(c), which requires that the statement of facts be "a fair summary without argument or comment," and that all stated facts be "supported by a reference to the page or pages of the record or the appendix where that fact appears." By misstating the record and omitting numerous crucial facts, Wilson has made it necessary for the appellees to go to great lengths to straighten out the record, and for the court to expend a great deal of time reviewing the record to find out what in fact happened in the district court. Although we recognize, as a practical matter, that litigants will give the established facts the interpretation that best supports their case, Wilson's brief goes far beyond the acceptable limits
 
 
 [3]
 It is apparent that a great deal of the rancor which Wilson misdirects at the appellees in this case is a carryover from the intra-ITS squabble between Wilson and Starke and Weitzel. We do not consider what recourse Wilson might have against his two former partners as to the division of the equity of ITS. We are only faced with, and therefore only decide, Wilson's claims against the appellees in this case
 
 
 [4]
 CIC was not a party to the shareholder litigation. A transfer of the assets constituting CIC's collateral would have created a default under CIC's loan agreements with ITS and AFS. Recognizing this, the parties included language in the orders to satisfy CIC
 The initial order provided:
 ... No action shall be taken hereunder in furtherance of any provision of this final judgment which could in any respect affect any right, title, interest or security of any secured creditor of ITS, Inc. or any of its subsidiaries or affiliates ... without the express written consent of such secured creditor.
 
 
 [5]
 AFS was formed in 1982 by ITS as ITS/Andy Frain Inc. and later changed its name to Andy Frain Services, Inc. Shortly after its formation, AFS purchased the assets of companies operating under the Andy Frain name. The four Frain Companies and other selling parties (certain shareholders) retained a security interest, subordinate to CIC's, on the assets of AFS and a first lien on the common stock of AFS to secure purchase price indebtedness exceeding $2,000,000. (The Andy Frain Dissolution Trust ("AFDT"), formed in connection with the asset sales, shall be deemed to include all the selling parties.)
 
 
 [6]
 According to CIC, the loan defaults included:
 (i) ITS was in arrears on federal withholding taxes, state workman's compensation taxes and state unemployment contributions in an amount exceeding $625,000;
 (ii) AFS was in arrears on federal withholding taxes, state workman's compensation taxes and state unemployment contributions in an amount exceeding $585,000;
 (iii) ITS had outstanding trade payables 90 days or more overdue exceeding $500,000;
 (iv) AFS had outstanding trade payables 90 days or more overdue exceeding $500,000; and
 (v) ITS and AFS were in violation of the net worth, and debt to net worth ratios contained in the loan agreements by maintaining a negative net worth, on a consolidated basis, exceeding $335,000.
 
 
 [7]
 An overadvance occurs when the borrower has borrowed funds equal to its funding limit under the advance ratio in effect and still requires additional funds. The additional funding, if made, is an overadvance. CIC generally loaned funds to AFS and ITS at a ratio of 80 percent of eligible accounts receivables, as defined in the loan agreements. Beginning in March 1984, CIC reduced the advance ratio for new loans to 65 percent to reduce its overall exposure. Hence, AFS and ITS had less cash available to pay suppliers and other creditors
 
 
 [8]
 The committee was appointed by the United States Trustee to serve for AFS, ITS, and SAW. Not enough creditors of AFF expressed an interest in serving on a committee, so no committee was appointed for AFF
 
 
 [9]
 The financing agreements authorized by the bankruptcy court were substantially similar to the agreements that existed prior to the bankruptcy
 
 
 [10]
 Although neither CIC nor AFDT had yet consented to any transfer of assets as required by the Wilson Case Orders, and no transfer had occurred, the shareholders had worked toward a solution with Wilson taking over AFS and AFF, and to that end Wilson had assumed managerial control of AFS and AFF in March 1984. Up until the entry of the financing orders, Wilson had continued to request and receive CIC loans for AFS
 
 
 [11]
 Wilson's unsubstantiated and inaccurate claim that he was removed from management notwithstanding, Judge Hertz found, after considering the evidence, that Wilson resigned, leaving a void that had to be filled if AFS was to continue in business. Wilson does not claim, and indeed he could not given his irresponsible actions, that Judge Hertz's finding was erroneous
 
 
 [12]
 Wilson never filed any affidavits controverting the CIC affidavits or sought to depose the affiants
 
 
 [13]
 In one of the many disturbing incidents involving Wilson and his counsel, Wilson appeared initially at the examination requested by the Committee and refused to answer various questions based on advice of his counsel, William Gotfryd. Judge Hertz then ordered Wilson to appear at the resumption of the examination to answer questions. Mr. Gotfryd, who had appeared on behalf of Wilson before and who was present throughout the resumed examination, took the position that he no longer had authority to represent Wilson and therefore Wilson was without an attorney. Both Wilson and Gotfryd said only Gotfryd's superior, James Sloan, could represent Wilson and he was out of the country. Accordingly, Wilson continued to refuse to answer questions. The bankruptcy court entered an order certifying to the district court the question whether this conduct was a contempt of court. Subsequently Mr. Gotfryd continued to represent Wilson in the bankruptcy case and on this appeal, even presenting a portion of Wilson's oral argument
 
 
 [14]
 The Committee later joined the motion
 
 
 [15]
 Paragraph (iv) provided:
 Hearings on (a) the proposed sale of assets pursuant to Sec. 363 of the Code; (b) the proposed allocation of sale proceeds and, if necessary, valuation of the assets of AFS and AFF; (c) the adequacy of the proposed Terms of Sale and Purchase Contract; (d) the proposed payment of sale proceeds to Secured Parties as requested in the Joint Motion; and (e) all objections, if any, filed with the Bankruptcy Court as required under paragraph (ii) above shall be held before Bankruptcy Court, Room 1646, 219 South Dearborn Street, Chicago, Illinois at 11:00 a.m. on March 13 and 14, 1985.
 
 
 [16]
 Wilson's claim of lack of notice is difficult to understand. He participated in the scheduling hearings, had actual knowledge of the express terms of the February 12 order and notice, and filed extensive objections pursuant to the very same order. Furthermore, his counsel appeared at February 19, 1985 and March 4, 1985 hearings before Judge Hertz, at which the upcoming evidentiary hearings were discussed
 
 
 [17]
 Although we granted Wilson's petition and ordered Judge Parsons to rule on Wilson's motion to dismiss, by the time Judge Parsons received our order, during the April 1, 1985 hearing, he had already ruled on the motion. Our decision to issue the writ of mandamus was based solely upon Wilson's representations in his petition, as we did not request any response from the other parties
 
 
 [18]
 Wilson alleges that he did not have a complete opportunity to cross-examine Francis Frain. Under the circumstances, however, it is clear that Judge Parsons afforded Wilson's counsel ample opportunity to cross-examine Frain. Any failure to complete the cross-examination was primarily attributable to Wilson's counsel's choice to devote his time to rearguing his theory of the case with the court and the other attorneys rather than to questioning Frain on relevant matters. The court certainly indulged him with generous time and leeway to make the points he desired to make. No litigant has an unrestricted right to unlimited time to cross-examine a witness, particularly when he has already abused the process. At the time Judge Parsons issued a ruling, the proponents of the sale had already presented overwhelming evidence in favor of it, and Wilson's attorney had not presented any evidence or raised any questions on cross-examination to negate the evidence
 
 
 [19]
 At the September 13, 1984 hearing, Sloan asserted:
 And the failure to address in a very simple proceeding, the issue on the motion to dismiss, which is, your Honor--and the facts are not in dispute.
 You can take judicial notice of your orders. You can take judicial notice of the filing of the bankruptcy petitions by Mr. Weitzel and Mr. Starke on behalf of the so-called unlawful board of directors.
 * * *
 MR. SLOAN: If on the basis of judicial notice--
 THE COURT: Let me talk--
 MR. SLOAN: --of facts, without any--we don't need more of Mr. Wilson's money spent on opposing him on this motion for an unlawful appropriation of his assets.
 Your Honor can on the basis of judicial notice of those simple facts dismiss these Chapters 11s....
 Tr. at 45-46 (emphasis added). At the October 15, 1984 hearing, Sloan argued:
 Your Honor, Citicorp seeks to now take discovery in relation to the motion to dismiss on the assumption that there are controverted issues of fact.
 It has been the position of Wilson that there are no genuine material issues of disputed facts to be decided on the pending motion to dismiss; that the matters upon which the Court can and should predicate its decision, are matters already of record before this Court--that is, this Court's orders, the matters of record in the bankruptcy proceedings, and the matters even conceded in the papers of the respondents.
 In addition to the one predicate or grounds which we have urged that these proceedings were commenced unlawfully--that is, there was no corporate authority--in addition, there was a contravention of this Court's orders. We also believe, your Honor, that in the alternative there are no genuine issues of material fact in relation to the contention of Wilson that it is in the best interest of the creditors and debtors of Andy Frain Services and Andy Frain Florida to dismiss these proceedings.
 So the assumption that we need discovery is based upon the assumption that we have evidentiary hearings and based on the assumption that there are genuine issues of material fact--and since all of this has been briefed, it is very strange that we would have this eleventh hour motion coming before this Court, your Honor.
 Now, it would appear that most of the relief sought by Citicorp would be mooted by a favorable ruling on the motion to dismiss presented by Wilson if indeed there are no genuine issues of material fact, your Honor.
 So it would be appropriate for the Court to go forward with the hearing tomorrow to determine whether or not there are genuine issues of material fact. And to the extent that the Court deems it appropriate to have an evidentiary hearing on any remaining issues of fact, we would ask the Court to set forth the specific order as to what those issues are and what issues your Honor would want us to make presentations on, and to the extent to which your Honor deems discovery appropriate, that could be pursued. But there is no question from our reading of all of the papers filed by the respondents that there is no genuine issue of material fact, that these Chapter 11 proceedings were unlawfully commenced.
 Tr. at 16-18 (emphasis added).
 
 
 [20]
 We note that at the November 8, 1984 hearing Wilson's counsel reiterated Wilson's position that "there doesn't even necessarily have to be a hearing actually held." Tr. at 16
 
 
 [21]
 28 U.S.C. Sec. 158 provides, in relevant part:
 Sec. 158. Appeals
 (a) The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.
 * * *
 (d) The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section.
 
 
 [22]
 Wilson states in his brief, without any citation to the record, that "[t]his conflict between Francis Frain's role as a major alleged creditor and agent for the estate was raised before his appointment...." Appellees assert, and we concur based upon our own independent review of the district court record, that Wilson's statement is utterly false. This is but one of many examples where Wilson has misrepresented the record in an attempt to reconstruct a record more to his liking. Ethical considerations aside, such a disturbing lack of candor and forthrightness creates no tactical advantage, since it causes the court to view every assertion of that litigant with a more critical eye
 
 
 [23]
 11 U.S.C. Sec. 363(m) provides in part:
 The reversal or modification on appeal ... of a sale ... of property does not affect the validity of a sale ... under such authorization to an entity that purchased ... in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... [was] stayed pending appeal.
 
 
 [24]
 Wilson has no excuse for not following the appropriate procedure. Counsel for CIC, Larry Nyhan, informed him of the correct procedure during the March 21, 1985 proceeding. Tr. at 13. Mr. Nyhan said:
 If I can correct Mr. Gotfryd [Wilson's attorney], the structure of the sale as is customary in the bankruptcy proceedings does not condition the sale upon the exhaustion of appeals.
 As your Honor is well aware, it is very difficult to sell to anyone if they have to wait for the appeal process to expire for two years. And, in fact, the Bankruptcy Code specifically provides that the reversal of an order on appeal will not affect the sale to a good faith purchaser unless a stay of that sale has been obtained.
 I suggest to the Court that if Mr. Gotfryd wishes to delay the sale on the basis of his appeal, that his recourse is to seek a stay of that order and to bond it as everyone else is required to do, so that the estate is not injured because the sale does not go forward.
 
 
 [25]
 In one hearing, Judge Parsons offered to enter a standing objection, on behalf of Wilson's counsel, to everything that transpired, in order to allow the other attorneys to make their presentations without constant interruptions
 
 
 [26]
 Even if we were to accept Wilson's characterization of the NM & S letter, only $520,000 of the AFDT claim would be at issue. We note that even subtracting that amount, the Blair offer exceeded the other offers